WOOTEN *v.* STATE.

4688                                          249 S. W. 2d 968

Opinion delivered June 16, 1952.

Rehearing denied July 7, 1952.

*Walter L. Brown, Love & Love* and *Stein & Stein,* for appellant.

*Ike Murry,* Attorney General, and *Dowell Anders,* Assistant Attorney General, for appellee.

ED. F. McFADDIN, Justice. Robert Wooten was convicted of murder in the second degree for the homicide of R. A. Baker, and brings this appeal. The Motion for New Trial contains nine assignments,[1] which we group and discuss in topic headings.

I. *Sufficiency Of The Evidence.* Assignments 1, 2, and 3 in the Motion for New Trial are included in this topic; and we review the evidence in the light most favorable to the verdict, as is the rule on appeal. *Bly* v. *State,* 213 Ark. 859, 214 S. W. 2d 77; and *Yarbrough* v. *State,* 206 Ark. 549, 176 S. W. 2d 702. The deceased, R. A. Baker, owned two roadhouses, or beer joints, on U. S. Highway 82, near Strong, Arkansas. These taverns were located directly opposite each other on the highway. One establishment was known as the ''82 Drive In,'' and was managed by Baker's employee, Clegg Smith. The other establishment was the ''Lion Cafe,'' and was managed by Baker in person. At the Lion Cafe there were waitresses, who served food and beverages to patrons at tables inside the building, and to patrons in cars outside the building.

On October 1, 1951, appellant, Robert Wooten, aged 52 years, and his son, Melton Wooten,* likewise a mature

---

[1] In felony cases, we consider every assignment in the Motion for New Trial; *Martin* v. *State,* 206 Ark. 151, 174 S. W. 2d 242; and *Boyd* v. *State,* 215 Ark. 156, 219 S. W. 2d 623.

* Melton Wooten was separately tried and convicted for the homicide of R. A. Baker. Melton Wooten's appeal is numbered 4689; and his conviction is affirmed in an opinion this day delivered by this Court.

man, drove to the 82 Drive-In at about 4:00 P. M., and each drank a considerable quantity of beer. For convenience, we refer to these men as "Robert" and "Melton." After a time they left the 82 Drive-In and went across the highway to the Lion Cafe. That they had been drinking was obvious. They both entered the building, and Robert went to the restroom. Melton stopped at a table to talk to some friends. When the waitress came to the table, Melton placed his hands on her in a too familiar and highly suggestive manner, and she slapped him. The waitress reported the occurrence to Baker, who was then in the kitchen; and Baker went to Melton and asked him to leave the place on account of his condition and conduct. Baker escorted Melton and Robert to the door, and the latter said as he was leaving that he would be back and that no one could throw him out.

Robert and Melton left the Lion Cafe and went across the highway to the 82 Drive-In, where they seated themselves at a table and ordered some more beer. While so seated they discussed—loud enough to be heard by a witness—the experiences with Baker at the Lion Cafe and what they intended to do about it. Melton told Robert that they should "go back over there and settle it"; and Robert Wooten said: "He may think I am scared of him because I am an old man, but I am not. I will use my knife."

When Robert and Melton ordered a second round of beers, in the course of the said conversation, Clegg Smith, the manager, refused to serve them and closed up the 82 Drive-In for the night. It was then about 8:30 P. M. Robert and Melton went back across the road to the Lion Cafe. Melton went in first, followed by his father, Robert. They went to the counter and ordered some beer. Baker told them to leave and picked up a sawed-off end of a billiard cue, and escorted them out the door to the open space between the cafe and the highway, where some cars were parked for service. It was in this open place that the struggle ensued which resulted in Baker receiving fatal wounds.

When Baker accompanied Robert and Melton outside the Lion Cafe, Robert dropped behind. Some one

screamed a warning to Baker that Robert was attacking from behind; and this was just as Robert Wooten slashed Baker on the shoulder. Baker wheeled and hit Robert on the head with the pool cue, then being used as a billy.[2] The blow knocked Robert Wooten to the ground, but he retained his grasp on the knife which he was using as a weapon. Melton attacked Baker and they struggled, and while in such struggle, Robert, from a crouching position, struck at Baker with the knife and inflicted a serious injury on the left thigh. Others intervened to end the struggle. Baker was rushed to the hospital, but died in a matter of minutes. The physician who treated Baker testified of his wounds as: (1) a slash in the shoulder 3 inches long and 1 inch deep; (2) a slash across the chest 4 inches long; and (3) the wound in the left thigh that was 3 or 4 inches long. The physician testified that Baker died from loss of blood from the cut last mentioned.

From the foregoing facts, it is clear that the jury could well have found that Robert and Melton plotted the fatal attack when they were seated in the 82 Drive-In, and then returned to the Lion Cafe to carry their plans into execution. Robert's words:—"He may think I am scared of him because I am an old man, but I am not. I will use my knife."—was evidence of premeditation. When the homicide is without provocation and done with a deadly weapon, the law will imply malice. Under all the facts, the trial court was correct in instructing the jury as to murder in the first degree and second degree; and there was ample evidence to sustain the verdict for second degree murder. See *Bly* v. *State,* 213 Ark. 859, 214 S. W. 2d 77; *Everett* v. *State,* 213 Ark. 470, 210 S. W. 2d 918; *McGaha* v. *State,* 216 Ark. 165, 224 S. W. 2d 534; and *Ballentine* v. *State,* 198 Ark. 1037, 132 S. W. 2d 384. There is no assignment in the motion for new trial claiming an error in any of the instructions.

II. *Events Occurring In Absence Of Defendant.* In assignment No. 4 in the Motion for New Trial, appel-

---

[2] The said billy claimed to be used by Baker, and the knife claimed to be used by Robert Wooten, were both introduced in evidence and have been brought to this Court as exhibits, and have been examined.

lant claims that the Court erred in allowing the Prosecuting Attorney to tell the jury—in the opening statement—as to what happened in the Lion Cafe when Melton put his hands on the waitress and she slapped him. Likewise, in assignment No. 5 in the Motion for New Trial, the appellant claims that the testimony of the witness was inadmissible as to such occurrences. The appellant's objection is, that Robert Wooten was not in the Cafe at the time of the occurrence, and could not be charged with the remarks then made. In denying the appellant's objection to the Prosecuting Attorney's opening statement, the Court said:

"I think that is proper evidence, especially in view of the fact that your theory of the case is that the defendant had a right to protect the life of his son—if that is your defense. I think it is a matter of motive and that the jury has a right to know what the trouble started about—the objection is overruled. I will go this far, gentlemen—that any detailed conversation between other parties not in the presence of this man, generally is not admissible."

Trial courts have wide discretion in supervising trials, including opening statements. *Stanley* v. *State*, 174 Ark. 743, 297 S. W. 826. Of course, if the testimony was admissible in the trial, then there was no error in allowing the Prosecuting Attorney to refer to it in the opening statement. *Morton* v. *State*, 180 Ark. 197, 20 S. W. 2d 872.

We hold that the evidence was admissible as limited by the Court to exclude conversations in Robert Wooten's absence. After Melton's experience with the waitress, Baker escorted Melton from the Cafe. Witnesses testified that they heard Melton report the occurrence to Robert, and then heard Robert make the remark: "He may think I am scared of him because I am an old man, but I am not. I will use my knife." So Melton's experience with the waitress and his expulsion from the Cafe were events that he reported to Robert, and these events were a link in the chain of proof and gave the jury the background for the subsequent occurrences.

III. *Other Rulings As To Evidence.* In assignments 6, 7, and 8, appellant complains as to three of the Court's rulings:

(a) The witness, Clegg Smith, was asked as to what he heard Robert, Melton and Baker say, when Baker was escorting Melton out of the Cafe, just before the fatal attack. This occurred:

"Q. And they were talking about something?

"A. R. A. told Melton to leave that knife in his pocket.

"Q. Did they say anything else?

"A. That is all I heard at any time or paid any attention to—they were merely talking, he was telling he didn't want any trouble or anything.

"MR. BROWN: This witness is drawing conclusions.

"THE COURT: If he heard any conversation he can state what he heard—not his conclusion.

"MR. BROWN: Save our exceptions.

"Q. Is that what you heard?

"A. That is all I heard."

The foregoing excerpt from the record shows that the Court excluded everything except actual conversation; so there was no error in the ruling.

(b). When Dr. Price was testifying as to the wounds he found on Baker, the appellant asked this question:

"Could you venture an opinion the position of a man that gave a wound like that,—if he was stooping down?"

The Prosecuting Attorney objected to the question, and the objection was sustained.

The defendant saved exceptions, but never made any effort to show what the witness would have said if he had been allowed to answer the question. The witness might have said that he had no opinion on the matter, or might have testified in a way unfavorable to the defend-

ant. At all events, until the record shows what answer the witness would have made, we have nothing on which to predicate any error in the Court's ruling. See *Baldwin* v. *State,* 119 Ark. 518, 178 S. W. 409.

(c). The appellant asked the witness, Vestal, a question, and this occurred:

"THE COURT: You need not answer that question.

"MR. BROWN: Save our exceptions."

Here again there was no offer by appellant to show what answer the witness would have made, so the appellant has failed to show that he was prejudiced by the Court's ruling.

IV. *Cross-examination of Defendant.* Finally, in Assignment No. 9 in the Motion for New Trial, appellant claims that the Court allowed the Prosecuting Attorney to go too far in the cross examination of the defendant. Several character witnesses had been offered by the defendant to establish his good reputation. Then the defendant took the stand, and on cross-examination, the State obtained from him the admission that he had pleaded guilty to making liquor, had paid a fine of $600 therefor, and in addition had been put on three years probation. Then this occurred:

"Q. Is that the first time you were up there for making whiskey?

"A. Yes, sir.

"Q. Now it is a fact that you have still been making whiskey and selling it to Bill Mitcham, isn't it?

"A. No, sir, I have not.

"MR. BROWN: Objections.

"THE COURT: I think it is a collateral matter—objection overruled.

"MR. BROWN: Save our exceptions."

Thus the record reflects that the defendant answered in the negative the question asked by the Prosecuting

Attorney before any objection was made by the defendant's counsel or any ruling by the Court. After the ruling by the Court, the State did not pursue any further that line of questioning, so no error resulted.

The judgment is affirmed.